Good morning, Your Honors. My name is Howard Davis. I represent the Petitioner Mr. Mogos, and I'd like about two minutes to reserve for rebuttal. In this case, no matter which way you look at it, be it through the lens of a case like Kataria, because I don't think it is all clear that the judge did make an adverse credibility decision in this particular case, and therefore no corroborating evidence is required, or through a case like Sithu, which was and Chepchup, which was suggested by the, in the Respondent's brief, the record compels an opposite result from that which was determined by the judge. But, for example, in Sithu, the Court is going to require corroborating evidence where there might be reasons to question, where there is a failure to provide corroborating evidence easily available, and there is not a good reason for the alien's So the question is, in this particular case, with regard, looking at it through Sithu's eyes, was the evidence easily obtainable? First of all, there is the judge, I think, mischaracterized the extent to which there, the extent to which there was no corroborating evidence, certainly as to identity. In the administrative record, there is, there are bank books from two Ethiopian banks which give the name of the Petitioner and note that he's a national of Ethiopia. Well, in this case, the I.J. did not expressly make an adverse credibility decision, did he? No, he did not. And he doesn't make an express adverse credibility determination supported by specific cogent legitimate reasons, then we take the testimony as true. And under our law, if we take the testimony as true, there is no requirement of corroborating evidence at all. Correct. I mean, then that's a case like Katari. And that's sort of the end of the analysis, isn't it? Yes, with, yes, with regard to, with regard to taking the facts as they are. So, I mean, I was just also responding to suggestions by, in Respondent's brief. Oh, I see. And that's, and because I definitely hold that Katari applies in this case because there was no clear adverse credibility, and therefore everything has to be believed. So what the ruling seems to be basically is that it's insufficiently detailed, plausible and complete. And that seems to be what the I.J. is saying. It's almost that the it's not not it's it's under a listing of credibility. But and that he uses the word credible on one or two occasions. But when he comes to the conclusion and when he really explains what he's saying is that he found the evidence for some reason, not that there was anything untruthful about it, but it just wasn't sufficiently detailed and complete explanation to justify relief. And actually, this is, this is, this is actually something that is actually of concern here, because on the one hand, the, first of all, the Administrator, I think that, first of all, that's kind of boilerplate language. The judge does not go into any explanation as to why he made that conclusion. And I think that the record is actually, is, it really compels an opposite decision here, because there were a lot of details. They, he, Mr. Mogos went into great detail about, for example, in when he was arrested in Eritrea in 93, which precipitated his flight. He mentioned the time. He mentioned how many people came to his home to arrest him. He mentioned the name of the prison and the hospital, as well as the number of individuals and what they were asking him about and who was there and what happened to each individual at his home when he was arrested, and went into details about what happened in the hospital, the name of the person at whose home he stayed after he escaped from the hospital, and, and how he left. With regard to, to Ethiopia, again, went into great detail about what happened, where he was taken to, how he was escaped. I mean, if that's, if that's vague, and another thing that, that's really of, of concern here is, is that he's, the first thing out of the, the Court's credibility decision is, is that everything's been consistent. And then he chides the man for having good memory. And, and then he makes a, a statement of, it is broad, it is, the Court does not believe that it is sufficiently detailed, and for reasons I stated, I think it was very detailed, consistent or credible in light of general conditions in the Respondent's home country. But if you take a look, that that doesn't watch in light of the country background reports, certainly with regard to the, of someone who's an ethnic Eritrean in Ethiopia. I mean, I think that the record was quite clear, and the judge even noted that, what was going on. I mean, he said he had a passport, and, and the record is clear that the government was confiscating the passports of ethnic Eritreans in Ethiopia. And so certainly the record is, it doesn't even begin to sustain that. So that's with regard to the relationship between the judge's finding and, and details and, and whether or not the country reports support that. I'm kind of troubled, maybe this, I should ask the government this, but it seems to me that the IGA's ruling was sufficiently in detail, general, and vague that I can't, but we can't really tell whether he actually made an adverse credibility determination or, so, you know, to the extent that he did, then your argument is it wasn't supported. Suppose we were to, to accept that, what do we do from that point of view? Suppose, I'm sorry. Suppose we were to accept that it, that he's credible. That he was credible. Yeah, what's the next step in the analysis? Well, then, of course, one of the, when, when the judge went on to consider well-founded fear, I mean, it was pretty much tainted by his finding that the Respondent, not Respondent, that the Petitioner had not made sufficient, had not, had not met his burden with regard to the proof. So, I mean, I suppose that if you take that, you can still do the analysis, and definitely what happened to him, the, the beatings, I mean, his leg was broken. I mean, that would certainly constitute past persecution, and based on the record, nothing has really changed. If the Court feels that it was so tainted by it that the judge did not really make the analysis with regard to past persecution. What do you, what do you mean when you say tainted? You mean tainted by the credibility finding? By, by the lack of, hold on, just. Well, I think your answer is yes to this question. He was. Right. No, no. Yeah. The answer, I was just looking in the, in the record to, to, to show where I, I mean, I used the word tainted, but, I mean, but it pretty much got down to, well, because he didn't have enough corroborating evidence, the judge really didn't go much further than that. But if he, if he's credible, then, then that creates a presumption of a well-founded fear, and the Court does go on to discuss whether or not he has a well-founded fear with reference to the country court. And in fact, if, if the judge said that, I mean, I think pretty much backed up. But if, I think that if the judge did find, he, he would have found that he had a well-founded fear, because that's the only thing that he could have, the only conclusion that he could have come to in, you know, based on the record. And I think that, you know, he does say. But he does, he makes the finding that he can't determine whether Mogos is either Eritrean or Ethiopian, Eritrean origin. Right. Well, and, and, and. Does that make a difference? Actually, if, if he can't do that based on what his concerns about sufficient corroborative evidence, there is a, there is an alternative approach as well. And, and that is the imputed approach. I mean, in the story that, in the, his narrative, he did say that when he was arrested in Eritrea, the, the officers criticized him and talked about the fact that he did not vote in the 1993 referendum, and basically made a statement that made him into the moral equivalent of the, of the derg, of the previous regime against whom they were fighting. The same thing with regard to Ethiopia, when they came in and accused him of being Eritrean. You have a half a minute. Do you want to, two minutes left? Yes. I think I will stop. Can I ask him one question about, about a different argument? The last argument you make is that the order of, of removal to Eritrea was improper. Right. And the government's response is that you've waived that argument and you didn't file a reply brief. Do you agree that you waived it? Well. Based on the fact that there was, that there was no reply brief or reply to that, to that footnote? Yes. Well, not only not because there was no reply, but for the reasons stated in the footnote. In other words. It was not waived. It was not raised below. You're raising these arguments for the first time in this appeal. Well, think about it. Maybe you can answer me when you get up to reply. All right. May it please the Court. Good morning. My name is Arthur Reagan. I represent the government. I will respond in this case. Attorney General John Ashcroft. Starting with the first issue the Court dealt with, which is credibility. We would beg to differ with Judge Wardlaw's reading of the record. There was an explicit adverse credibility finding in this case. And if we just direct the Court to page number 54 of the record of the I.J.'s decision, we would be able to determine whether or not Judge Wardlaw's reading of the record of the I.J.'s decision was correct. One second. Well, the question is whether that's a, you know, that's a cogent and specific reason, right? That's correct, Your Honor. But as to whether or not he did make on the record a specific explicit credibility finding, he did. He said, even though there are no specific inconsistencies in this application in the second paragraph, Your Honor. However, as stated above, the Court does not believe that it's sufficiently detailed, consistent, or credible. So you mean to say those are three separate reasons? Your Honor, that's correct. But I think the overall record And what does he base the credibility finding? I think What specific examples does he give to be cogent and to justify the finding that it was not credible? It appears he makes two specific references. One is the stories are, looks like they're patently identical. That is, easily remembered stories that he was arrested by soldiers in 93 and in 98. He was detained by soldiers in 93 and 98. He escaped. I mean, you get the Respondent for being inconsistent and contradictory, and then you get him for being consistent, right? Well, that's correct. But if it's too patently consistent, remember, there should be some amount of deference given to an immigration judge. What does that mean? What does it mean to be too patently consistent? That is, it looks like it was a rehearsed story, Your Honor. You mean he didn't have any lies or inconsistencies? He told a straight story without any contradictions? Your Honor, it's not that he didn't tell without contradictions. It's that the two stories appear to be remarkably similar. What's similar about them? They were soldiers. In 93, he's arrested. In 98, he's arrested, both times by soldiers. Both times he's detained. Both times he's beaten and interrogated. Both times he escapes miraculously. Both times he runs to a friend. And both times he escapes from the country via the use of a false passport. And if one of the times he didn't, he'd be dead and we wouldn't have this problem of having it happen, having this happen to a man in both Eritrea and Ethiopia. Suppose he just told the story once. Well, Your Honor, this is just what the I.J. found. And under the governing standard of review, deference should be given to that finding, as long as it's supported by the substantial evidence in the record. Well, that's the question. Is it to say that if somebody is beaten by soldiers twice in two African nations, that you can disregard that because you can only be beaten in one country? Well, okay. Then turning to the second reason the I.J. gave, which is his belief in that he would be persecuted if he was returned to Eritrea, because in 1993 he was accused of being a Jehovah's Witness and that he did not vote in the referendum. Yet when he's asked, well, what are the beliefs of a Jehovah's Witness, he only knew two. That is, that he was not allowed to give an oath, he's not allowed to give blood. He was never baptized. I don't think he was ever asked that open-ended question, was he? What are the beliefs of the Jehovah's Witnesses? Can you point to a record in Jehovah's Witnesses? On cross-examination, Your Honor, he was asked on cross as to what the beliefs were. Where was that question? Okay, Your Honor. Let me just locate that for you. He asks about medical practices and anything else in regard to medicine. And then he's asked specifically about an oath. And then he asks about baptism. He says, I would like to be baptized forever. I'm reading from... I believe it's on page one. Page what? 18, Your Honor. Okay. He was asked, well, on 117, he was asked about his continuous practice. You know, if you're a Jehovah's Witness, are you practicing right now? No, no. You were telling us how he didn't know about the contents of his religion. Of his religion. That's right. That's the question. The cross is basically asking him, you know, if you're a Jehovah's Witness, what have you been doing about it? No, no. That's not what you said. You said that you gave us a reason that he was not familiar with the tenets of the faith, if that's what it is. Yes, sir. And that's what we were asking about. Where was he asked and where did he show his ignorance of the tenets? Well, he was asked on page 118 and 119. It's specific questions. It's not general questions. Well, he was asked, you know, what are some of the tenets about religion and medical practice? And he said, I don't we don't give blood. Well, is there anything else in regard to medicine? I cannot remember. And what else is there in regard to medicine? Well, any layperson as Jehovah's don't take medicine. That's pretty reasonable, I think. I don't know. I don't think that's true, actually. They are not Christian scientists. Okay. Well, that that was where the cross was leading was, you know, about the medicine. Well, they have been leaving, but that's all right. Well, then he led. First of all, you're doing exactly the same thing. I did. I did. You're interjecting your own speculations about what the faith of the religion are. And you don't know any more than I do. I don't think. Oh, no, I'm not a Jehovah's Witness. But it's not on the record either. How about on the record? Well, what is it? Ask that question. He answered every specific question that was asked to him. And if if there's more about the Jehovah's Witnesses practices with respect to religion and what his answer is inconsistent, then it's the government's burden to put in the record what those practices are, so that then there can be a finding that what he testified to is not consistent with those practices. Or, you know, if either the I.J. or the government thought the record was incomplete and he should be asked more, they should have asked him. And they didn't do that. It's his burden. It's his burden to do what? To show that he knows what the faith is? Well, you're right. It's his burden to show that he's being persecuted on account of his religion. Oh, he is. He did. He testified and they asked him what about the medical practice. He answered the question. As far as we know, his answer is completely correct. What is it in the record that tells us it's not correct? This goes to credibility. I mean, it's not his burden to show he's not credible. Well, Your Honor, this is a finding of the immigration judge that basically all the only tenets of the faith that he gave on the record were that he was not allowed to give an oath. He was not allowed to give blood. That's all he was asked about. And the only reason to give to say that is to is to infer that that makes him not credible. Right. And it's not his burden to show he's not credible. If the I.T. wanted more information about the religion, he shouldn't have asked him. Well, the other information that was asked of him that went to credibility was that he was never baptized as a Jehovah's Witness. He was also asked.  There's more on that. So what? He described the practice. You become baptized when you become a certain age and you realize the teachings as an adult. And he said he would be baptized when he's spiritually ready. That's what he said. He did not. He did not say what you're saying. He said he said, OK, that's the reason he gave for not being baptized. But he said he was not baptized. And what's wrong with that? Well, if you're a member of a Christian religion. I don't know. Is this a Christian religion? Jehovah's Witness? Yeah. What is it? Believe in the Bible. Well, other people believe in the Bible, too. Even Jews believe in the Bible. And that's not a Christian religion. Not a New Testament. In any case, if I may continue. The other portion is that he never continued to practice his religion once he came to the United States in 1998. That's a plausible reason for that, too. And I can certainly understand it. He's saying he couldn't find a group, language barrier. And, frankly, Jehovah's Witnesses aren't exactly everywhere that one might be living in the United States. It's a very small minority religion. And so I mean, that's a very plausible explanation that he hasn't been able to find a group yet. Your Honor, that's for the Court to interpret. I only have 42 seconds left, Your Honor, if I could just move on to it. If the Court does find him credible, then it then moves to whether or not he proved his burden. That is, was there a past persecution that would arise to a presumption of future persecution? And in this case, there are only two incidents. One is 1993 in Eritrea. And the IJ here ordered him deported or removed to Eritrea. Thus, we are pretty much focused on that one incident. In 1993, soldiers came to him and said, you know, did you or did you not vote for the referendum bill of independence for Eritrea? And apparently he said no, and thus they broke his leg and they put him in the hospital. But that happened over 10 years ago. But he hasn't been there for 10 years. That's correct. But what I'm saying is, Your Honor, is that it's so attenuated. But why is it past persecution? It was past persecution. When it happened, it was persecution. Well, does it really amount to persecution when you're assaulted on a single incident over 10 years ago? No, no. Forget the 10 years ago. It was persecution when it occurred or it wasn't. It was we're talking about past persecution. So it doesn't matter whether it was 1 year ago or 10 years ago. Either when it happened, it gives rise to a claim of past persecution or not. Then we get to another issue with well-founded fear for the future.  But on the past persecution, okay, the single incident is not enough, you think, to show persecution? We would submit it's not, Your Honor. I mean, otherwise, you know, basically anybody that the soldiers can rough up and, you know, break a leg can say I was persecuted based on one incident. And we would submit it has to be something a little more sustained, such as a, you know, a much more prolonged period of persecution. Here it was only a single incident. Let me ask. Let me ask an underlying question. It appears to me that the IJ made a finding of persecution. Right. In other words, he said, even taking the respondent's testimony is in the best light and so forth. So since he made a finding, I think you're saying that so we can review that and under the proper standard, determine whether or not he's shown past persecution and or a well-founded fear of future persecution, right? Well, since the IJ made that. He made an alternative finding, Your Honor. That's correct. So we can review that. I did not find that he made a past persecution showing. Okay. Let's assume, just to try to pursue what we have before us and what we can deal with, let's assume we move on to step two and we disagree with the IJ and say that he's entitled to a finding of past persecution. All right. That then brings you to step three. Then he gets a presumption of a well-founded fear, which the government can rebut with country conditions. Is it your position that the IJ ruled on that sufficiently, that we can now either agree with him or disagree with him, as opposed to being required to remand, because he didn't consider that issue? I think as to whether it was rebutted, Your Honor, that issue was never considered. I don't think that was, and that should be reandered. Well, the IJ, I don't know. Maybe you can tell me. Was the country report for Eritrea? It was Ethiopia, Your Honor. I know. Well, so I've got the Ethiopia one. Was there one for the country to which he deported? No. Okay. Well, whose burden is that to rebut the presumption? When he deported him to Eritrea, that it's the government's burden to show that there's changed country conditions there, and there's no country condition report for that country. And that's why, Your Honor, I'm saying remand would be appropriate on that issue. Well, why? I don't think it's a second chance to do its case properly. Not give a second chance. It's just the IJ never made a ruling. Well, they couldn't make a ruling because there was no evidence. What Judge Wadler was saying was he never reached that issue because he found there was no persecution, so there was no reason to reach whether or not it was rebutted, right? That's correct, Your Honor. But had he reached it, there was no evidence by the government in rebuttal. Well, you know, at that point, he could have asked the government for a rebuttal had he reached that issue, Your Honor. Well, you don't know when you're putting on a case what issues the judge is going to decide. You put on your case. And you never know what issue the IJ is going to decide. So as I understand your position, that the government doesn't have to put in country conditions in the first hearing. It can wait until it finds out the IJ's ruling, and then when it loses, it can say, well, now we want another hearing where we can introduce country conditions. I think the — what happened here, Your Honor, is a bit of confusion because the Petitioner here said he was from Ethiopia, that he arrived to Holland from Ethiopia after living there, residing there, although he was of Eritrean ethnicity. Thus, I think that's why they put the Ethiopian report in there, and probably assuming that if there was going to be a removal order, it would be to Ethiopia. The Court does analyze the Ethiopia country report, and there's no reason to get there unless it's trying to determine the change circumstance that it's the wrong report. He doesn't have the correct report. So he's relying on the wrong information to deport this guy to Eritrea. Well, Your Honor, I don't know what to say. I mean, you ordered him to move to Eritrea, but the report is Ethiopia. Right. But he analyzes the Ethiopian report. I think he analyzes a single portion of it, which dealt with on page 155, which is what would happen to Petitioner if he were returned to Ethiopia. Right. Well, isn't that the incorrect analysis to be used when you're returning somebody to a different country? Well, Your Honor, I think as to Ethiopia, the analysis went there. As to Eritrea, where he was finally ordered to be removed, it didn't. And that's why we're asking for, if the Court reaches that issue, that it order a remand as to Eritrea, as to whether or not the government can rebut the presumption of a well-founded fear as to Eritrea, which is a separate country now, Your Honor. Subject to the Court's questions, I have no further questions. Thank you, counsel. Thank you, Your Honor. Your Honor, just with regard to whether about a finding with regard to possibility of persecution in Eritrea, on page 71 of the record, it says, And so therefore, certainly, with regard to Eritrea, there's no reason to remand, because the judge had already made a finding with regard to that, and his qualms  had to do with precisely the issue that's before the Court. And then with regard to Ethiopia, that, I mean, the record's in there, just as a – and then with regard – and there is a recognition that there were – that Adjoga witnesses were having problems in Eritrea. And then with regard to Judge Teshima's questions, I – I don't know what to say other than it was not raised below, and so I – it wasn't really properly briefed. So that's the cat claim. The cat claim. What? You're talking about the cat claim, that you didn't – that you waived the cat claim. No. I think that Judge Teshima was asking about whether or not the judge exceeded his authority by ordering Mr. Mogos removed to Eritrea. Oh, I see. I'm looking at your brief again, and it says that the 19 – there is a 1993 report for Eritrea in the record. I'm sorry. Which – where in the brief? Page 8 of your blue brief. I'm sorry. Page 8? Yeah. The 1999 country report confirms that the government of Eritrea engaged in practice of religious persecution against Jehovah's Witnesses. Okay. Now, yeah, I was looking at that myself, and the only – and I have to say that the only thing that I could find, because I don't see an Eritrea report in here, but on page 154 of the administrative record, I would – in the middle of the page that begins, in March, Jehovah's Witnesses says – okay. It says there are more than 3,000 members of Jehovah's Witnesses in the country. When the government began deporting Eritreans and Ethiopians of Eritrean origin in 1998, it decided that members of Jehovah's Witnesses of Eritrean origin who might face religious persecution in Eritrea were not to be subject to deportation. Now, first of all, there is a recognition there that Jehovah's Witnesses of Eritrean origin might face religious persecution in Eritrea. Now, with regard to, you know, the issue of whether or not they were deporting people back to Eritrea, the Petitioner did have his own experience, and he also said that he was not specifically a member of Jehovah's Witnesses. He was a believer and practitioner, but he was not officially a member because he had never been baptized. But in either case, if he's going to go back to Eritrea, there is definitely that recognition, and the judge made a finding with regard to that. Thank you, Ken. Thank you both very much. The case just argued will be submitted. The next case for argument is Cukrova. Cukrova. Mrs. Ashcroft. Pretty good to me. Very good. I'm better with a Central American name. Lopez Alvarado. May it please the Court, my name is Jonathan Monti, representing the Cukrova family. This case, Your Honor,
judges: Reinhardt, Tashima, Wardlaw